ON RETURN TO REMAND
COBB, Judge.
This case was originally assigned to another judge on the Alabama Court of Criminal Appeals. It was reassigned to Judge Cobb on January 17,1995.
On August 19, 1994, this court remanded this cause to the circuit court with directions that an evidentiary hearing be held to determine whether the appellant made a prima facie case of racial discrimination by the state in its exercise of its peremptory strikes.
On remand, the court held a hearing, and after finding that the appellant had established a prima facie case of discrimination, it required the state to give its reasons for using five of its seven strikes to remove blacks from the venire. The following reasons were given by the state:
“MS. MONTGOMERY: All right. Using the seating chart, I specified No. 28, which was C.B. My chart indicates he was a *960 black male. The State exercised a peremptory on this particular defendant because of his being single,- he was a dockworker, and he returned a verdict in favor of a defendant.
[[Image here]]
“MS. MONTGOMERY: The next person numerically, I believe, is 44, which was a black male. It was J.C. The State exercised its peremptory challenges to J.C. because of the minor broken bone that he had received. He was a hospital employee. And he used the quirkiest expression I have ever heard in regard to a relative when asked about being a police officer. He had a cousin-in-law. I’ve never heard that term, and it indicated some discord to me. Particularly, I would have some police officers to testify. But those are the three reasons for J.C.
[[Image here]]
“[MS. MONTGOMERY:] The next person was 237. It was a black female. V.P. V.P. had indicated she had never cursed and never been cursed. She had returned two not-guilty verdicts. That was the reason the State utilized that peremptory there.
“[MS. MONTGOMERY:] No. 306 was A.W. He also indicated he had never cursed or been cursed. He had had a minor broken bone, and he was a hospital employee. Those are the reasons for the State’s peremptories as to him.
“MS. MONTGOMERY:] No. 323, which was J.W. J.W. answered several questions in regard to the proper response when someone had cursed you or using racial slurs, derogatory terminology. He indicated he had been ... called a name, as well as his mother, and that fighting would be the proper response, at least one or two licks. And that was the reasoning used for the peremptories as to that particular person.
[[Image here]]
“[MS. MONTGOMERY:] My striking these particular persons, as I stated, was to get anyone who had any very minor broken bone, who was in the medical field, to be excluded, because I did not want their personal views as to the degree of force.”
(R. 9-13.) It does appear that the state had a legitimate race-neutral reasons for striking V.P. and J.W. In responding to the state, defense counsel made the following statements with regard to the other three jurors who were struck by the state:
“MR. WILKINSON: Oh, yes, sir. I did want to remark about each juror. First of all, with respect to J.C., No. 44, all Ms. Montgomery did was simply describe some factors about him, that he was a hospital employee. He had a relative who was a detective. And how calling this detective a cousin-in-law shows any enmity to the State, I’m sorry, but I don’t understand that. And he had injured his ankle in a bicycle accident, is my understanding. And I, frankly, think that those reasons are non-reasons, they’re non-starters, and that it’s just really a subterfuge for a racial strike with respect to J.C.
[[Image here]]
“[MR. WILKINSON:] Going on to C.B. Again, I don’t think just simply being unmarried is a non-racial reason. And I show that he was involved in a civil proceeding where he might have found for a defendant in a civil case, which to me would make him a better prosecution juror probably. And I think that reason is not meritorious.
[[Image here]]
“[MR. WILKINSON:] And then A.W. had had a broken bone also. But, like I say, there were other jurors who had broken bones. I mentioned one, 233. And he worked for Cooper Green. Again, he was a U.S. Marine, you know, and as far as I can see a fine juror. And there would be no reason to strike him, no legitimate reason other than his color.”
(R. 14-16.)
Following the hearing, the court found that the state “failed to give valid race-neutral reasons for the exercise of all of the strikes used to remove black members” from the venire. In Freeman v. State, 651 So.2d 576 (Ala.Crim.App.1994), this court set out the procedures for reviewing a trial court’s decision on a Batson motion.
*961 “In reviewing this ruling, we are mindful of our standard of review, as expressed in the following:
“The trial court’s ruling on a Batson motion will be reversed only if clearly erroneous. Nance v. State, 598 So.2d 30, 31 (Ala.Cr.App.1992); Jackson v. State, 594 So.2d 1289, 1294 (Ala.CrApp.1991). ‘It is well settled that the ruling of the trial court on a Batson hearing is entitled to substantial deference and will not be disturbed on review unless it is “dearly erroneous.’” Ex parte Bankhead, 625 So.2d 1146 (Ala.1993). In Ex parte Branch, 526 So.2d 609, 625-26 (Ala.1987), the Alabama Supreme Court approved the use of a “clearly erroneous” [standard] for reviewing the factual findings by the trial court in Batson [v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)] proceedings. In Bui v. State, 627 So.2d 855 (Ala.1992), the Alabama Supreme Court said, “‘the reviewing court’s inquiry ... shall not be restricted by the mutable and often overlapping boundaries inherent within a Bat-son-analysis framework, but, rather, shall focus solely upon the propriety of the ultimate finding of discrimination vel non.’” Bui v. State, citing Huntley v. State, 627 So.2d 1013 (Ala.1992).’
“Merriweather v. State, 629 So.2d 77, 88 (Ala.Cr.App.1993). The United States Supreme Court, in Hernandez v. New York, 500 U.S. 352, 364, 111 S.Ct. 1859, 1869, 114 L.Ed.2d 395 (1991), explained the rationale for this standard of review, as follows:
“ ‘Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in Batson, the finding will “largely turn on evaluation of credibility.” 476 U.S., at 98, n. 21, 106 S.Ct., at 1724, n. 21. In the typical peremptory challenge inquiry, the decisive question will be whether counsel’s race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor’s state of mind based on demeanor and credibility lies “peculiarly within a trial judge’s province.” Wainwright v. Witt, 469 U.S. 412, 428, 105 S.Ct. 844, 854, 83 L.Ed.2d 841, ... (1985), citing Patton v. Yount, 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 ... (1984).’ ”
We have carefully reviewed the transcript of the evidentiary hearing in this case and we cannot say that the trial court’s finding that the state failed to give race-neutral reasons for its strikes of J.C., C.B. and A.W. is clearly erroneous. Therefore, we must uphold the trial court’s decision on this matter. The judgment is reversed and the cause remanded to the trial court for a new trial.
REVERSED AND REMANDED.
All the Judges concur.